IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **EDWARD L. HARRIS, et al.,** | : | **CIVIL ACTION** |
| Plaintiffs, | : | |
| | : | **NO. 10-3198** |
| | : | |
| **KFC U.S. PROPERTIES, INC.,** | : | |
| Defendant. | : | |

# M E M O R A N D U M

**STENGEL, J.**                                                          **June 18, 2012**

Edward Harris was "pistol-whipped" and assaulted by Michael Henry, a KFC employee, when he hesitated while placing his order for the chicken special at a KFC in Philadelphia. Harris filed this lawsuit alleging that KFC is liable for Henry's actions under the doctrine of *respondeat superior* and that KFC failed to train, supervise and investigate Henry or warn Harris. KFC contends Henry's actions were outrageous and, not surprisingly, outside the scope of his employment. KFC denies any negligence or knowledge that its employee possessed a weapon. KFC filed a motion for summary judgment, which, for the following reasons, I will grant.

## I. BACKGROUND

### A. Henry's Assault of Harris

On October 3, 2007, between approximately 8:00 and 9:00 p.m., Harris drove to a KFC restaurant located at 716 Adams Avenue in Philadelphia, Pennsylvania to take advantage of a chicken special they were running at that time. (Harris Dep. 10:7-11:4, May 17, 2010.) KFC offered a bucket of ten pieces of chicken, biscuits, and two side orders for about eight dollars. (Id. at 10:18-21.) Harris placed his order for the chicken

with one employee but hesitated on the side orders.  (Id. at 11:23-24.)  A second KFC employee, Michael Henry,[1] told Harris to "hurry up."  (Harris Dep. at 12:1-2, May 17, 2010.)  Because Henry was not the cashier that was taking Harris' order, Harris replied, "No, I am not dealing with you."  (Id. at 12:6-9.)

Apparently agitated by the customer's response, Henry enounced, "Well, do you want the fucking chicken or not?"  (Id. at 12:10-11.)  The original employee helping Harris stepped back at this point with a look like "I'm out of it," according to Harris' deposition testimony.  (Id. at 12:21, 14:10-11.)  Harris was taken aback by the employee's rude statement and hesitated.  Harris then told Henry that he did not want to order if he had to deal with him.  (Id. at 12:22-23.)  Henry responded by asking Harris if he thought he was a "tough guy" and muttered, "I will kick your ass."  (Id. at 12:24-13:2.)  Henry then "showed" Harris a gun, which he held "under the countertop."  (Id. at 13:2-3.)  Harris put his hands up and said, "What?  You going to shoot me over a bucket of chicken?"  Henry repeatedly said, "I will kick your ass."  (Id. at 15:7-10.)

At this point, another KFC employee yelled at Henry that he could not "do it like that, not here."  (Id. at 15:16-19.)  With Henry distracted, Harris used this moment as his opportunity to leave the store.  (Id. at 16:1-3.)  Harris headed for the double doors to leave the KFC.  (Id. at 16:1-9.)  Harris went through the first door, but as he went to open the second door, he heard scuffling behind him and turned around.  As he turned he was attacked by Henry who struck him with the gun in the left side of his face.  (Id. at 16:6-8,

---

[1] Nicole Rodriquez, an employee working at the time of the incident, identified Henry as the second employee.  (Rodriquez, Investigation Interview Record, Oct. 22, 2008.)

18:18-23.) Harris lost consciousness, sustained a concussion, and was transported by ambulance to the emergency room for treatment of injuries, including eight stitches on his lip, "rattled" teeth, a black eye, a swollen jaw and a fractured wrist. (Id. at 27:2-6, 27:14, 30:1-4.)

### B. KFC's Employment Practices

At the time Henry was hired in 2007, KFC required potential employees to fill out a paper application and questionnaire. (Frazier Dep. 8:12-14, Aug. 8, 2011.) The application asked whether the applicant had a prior felony charge but background checks were not performed unless the open position was in management. (Id. at 8:24-9-1.) Henry's position -- "team member"[2] -- did not fall into the category of management and thus a background check was not performed. (Id. at 10:10-20.)

KFC has policies and procedures for managers and team members to follow in their day-to-day employment. (Id. at 14:20-18:3.) One such policy is a ban on weapons at work. (Id. at 13:22-24, 16:23-17:1.) If an employee brings in a gun or weapon in violation of this policy, a manager is required to fire the employee. (Id. at 14:5-6.) An employee can inform KFC of a violation using an anonymous 1-800 number available for such disclosures. (Id. at 17:5-13.) KFC's policies are outlined in the "Code of Conduct," which each employee signs to demonstrate his or her understanding of the

---

[2] Mr. Henry's position as a team member meant his roles were limited to cook or cashier. (Frazier Dep. 10:13-23, Aug. 8, 2011.)

3

proper rules and procedures to follow while working at KFC. (Id. at 15:1-6.) KFC does not expect an employee to ever have or use a weapon while working.[3] (Id. at 16:16-22.)

### C. Henry's Prior Criminal History

Prior to the incident at KFC, Henry was arrested on a few occasions and convicted of two criminal charges.[4] (See Doc. No. 23-2 at Ex. B[5], pgs. 1-26.) On October 17, 2001, Henry was arrested and charged with theft by receiving stolen property, attempted theft by unlawful taking or disposition, possessing instruments of crime, prohibited offensive weapons, and unauthorized use of an automobile and other vehicles. (Id. at p. 22.) On these charges, Henry was found guilty of theft by receiving stolen property. (Id.)

On December 18, 2002, Henry was arrested and charged with theft by unlawful taking or disposition, unauthorized use of an automobile and other vehicles, theft by receiving stolen property, and criminal mischief. (Id. at p. 18.) All of these charges were ultimately dismissed. (Id. at p. 19.) On February 18, 2003, Henry was arrested and charged with theft by unlawful taking or disposition, theft by receiving stolen property, and unauthorized use of an automobile and other vehicles. (Id. at p. 9.) On these

---

[3] In the event of an armed robbery, employees were trained to comply with the gunman in a nonviolent fashion, meaning a gun would not be appropriate in any situation at KFC. (Id. at 13:14-21.)

[4] In 2000, Mr. Henry was charged with theft by unlawful taking or disposition, unauthorized use of an automobile and other vehicles, theft by receiving stolen property, and criminal mischief, but the disposition of these charges is not clear on the record. As a result, these charges are not factored into Mr. Henry's convictions, but this case would be considered an arrest. See Doc. No. 23-2 at Ex. B, pgs. 16-18.

[5] Michael Henry, Municipal Court of Philadelphia County, Criminal Docket, Docket Numbers: CP-51-CR-0401241-2003, MC-51-CR-0759231-2000, MC-51-CR-1257661-2002, CP-51-CR-1014681-2001.

charges, Henry was found guilty of the unauthorized use of an automobile and other vehicles. (Id.)

### D. Procedural History

Harris initiated a lawsuit against KFC in the Court of Common Pleas of Philadelphia County, Pennsylvania. Henry alleges that KFC was negligent in failing to properly and adequately investigate its employees before hiring, train employees, warn the plaintiff, supervise its employees, police its premises, and KFC permitted Henry to have access to a weapon. (Compl. at 2.) Harris' wife, Marjorie, alleges loss of consortium. (Compl. at 3.) KFC removed this action to federal court based on this court's diversity jurisdiction.

## II. STANDARD OF REVIEW

Summary judgment will be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). A factual dispute is "material" only if it might affect the outcome of the case. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). For an issue to be "genuine," a reasonable fact-finder must be able to return a verdict in favor of the non-moving party. Id.

A party moving for summary judgment always bears the initial burden of informing the Court of the basis for its motion and identifying those portions of the record that it believes demonstrate the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). A party asserting that a fact cannot be or is genuinely disputed must support the assertion by citing relevant portions of the

record, including depositions, documents, affidavits, or declarations, or showing that the materials cited do not establish the absence or presence of a genuine dispute, or showing that an adverse party cannot produce admissible evidence to support the fact. FED. R. CIV. P. 56(c). Summary judgment is therefore appropriate when the non-moving party fails to rebut the moving party's argument that there is no genuine issue of fact by pointing to evidence that is "sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex Corp., 477 U.S. at 322; Harter v. GAF Corp., 967 F.2d 846, 852 (3d Cir. 1992).

Under Rule 56, the Court must view the evidence presented on the motion in the light most favorable to the non-moving party. Anderson v. Liberty Lobby, Inc., 477 U.S. at 255. The nonmoving party cannot avert summary judgment with speculation or conclusory allegations, such as those found in the pleadings. Ridgewood Bd. of Educ. v. N.E. for M.E., 172 F.3d 238, 252 (3d Cir. 1999). Rather, the nonmoving party must present clear evidence from which a jury can reasonably find in its favor. Id. Finally, in reviewing a motion for summary judgment, the Court does not make credibility determinations and must view facts and inferences in the light most favorable to the party opposing the motion. Siegel Transfer v. Carrier Express, 54 F.3d 1125, 1127 (3d Cir. 1995).

## III. DISCUSSION

KFC is entitled to summary judgment because (1) Harris cannot establish that Henry was acting within the scope of his employment under a *respondeat superior* theory and (2) KFC did not know, nor should it have known, that Henry had a propensity for

violence. In order to establish *respondeat superior* liability, Harris must establish four elements under the Restatement (Second) of Agency § 228. Harris cannot meet prongs (1), (3), and (4) under this theory because Henry's actions were outrageous and outside the scope of his employment. Additionally, Harris fails to demonstrate that KFC should have known that Henry had a propensity for violence under the Restatement (Second) of Torts § 317 because KFC did not have a duty to conduct a criminal background check, and even if it did, Henry's two prior distant criminal convictions for nonviolent crimes did not establish that Henry had a propensity for violence.[6]

### A. KFC's Liability Under a Theory of *Respondeat Superior*

The undisputed material facts establish that Henry's actions were outside the scope of his employment and so outrageous that KFC cannot be held liable based on the doctrine of *respondeat superior*. Under Pennsylvania law, an employer is vicariously liable under a theory of *respondeat superior* for the wrongful act of its employee "if that act was committed during the course of and within the scope of [his or her] employment." Brezinski v. World Truck Transfer, Inc., 755 A.2d 36, 39 (Pa. Super. Ct. 2000) (citing Fitzgerald v. McCutcheon, 410 A.2d 1270, 1271 (Pa. Super. Ct. 1979)). This vicarious liability extends to cover intentional and criminal acts committed by an employee unless the act is done for personal reasons or performed in an outrageous manner. Id.

Pennsylvania courts apply the Restatement (Second) of Agency § 228 when determining whether an employee's act was within the scope of his or her employment.

---

[6] KFC requests that I strike Harris' response to the defendant's motion for summary judgment as untimely because it was to be filed by September 23, 2011 but Harris did not file his response until October 6, 2011. I will deny this request.

7

Brumfield v. Sanders, 232 F.3d 376, 380 (3d Cir. 2000); see also Costa v. Roxborough Mem'l Hosp., 708 A.2d 490 (Pa. Super. Ct. 1998); Fitzgerald v. McCutcheon, 410 A.2d 1270, 1271 (Pa. Super. Ct. 1979). Under § 228, an employee's conduct is within the scope of employment if:

> (1)   it is of a kind and nature that the employee is employed to perform;
> (2)   it occurs substantially within the authorized time and space limits;
> (3)   it is actuated, at least in part, by a purpose to serve the employer; and
> (4)   if force is intentionally used by the servant against another, the use of force is not unexpected by the employer.

Fitzgerald, 410 A.2d at 1272 (Pa. Super. Ct. 1979) (citing Restatement (Second) of Agency § 228).

In Matsko v. United States, the Third Circuit applied Pennsylvania law when a plaintiff sued the United States under a theory of *respondeat superior* after a federal employee assaulted the plaintiff during a business visit. 372 F.3d 556, 559. The plaintiff was meeting with one employee and borrowed an empty chair from a second employee's desk for the meeting. Id. at 557. After realizing his chair was missing, the second employee approached plaintiff, told him that he was in his "----ing chair," and slammed the plaintiff's face into a briefcase, causing severe injuries. Id. After the incident, several employees conveyed to the plaintiff that the employee's behavior was not surprising. Id. at 558.

Before applying § 228, the court defined the extent of the "act" in question. Id. The plaintiff argued that the employee's "act" was limited to his retrieval of the chair,

which was integral to his job, and therefore within the scope of his employment. Id. The court, however, found that the employee's "act" started when the employee approached the plaintiff and ended with the assault. Id. Thus, the employee's act was the "aggregate of [his] actions," rather than just the retrieval of the chair. Id. at 559.

The court then applied § 228 and found that the employee's conduct was not within the scope of his employment. Id. at 560. The second prong was satisfied because the conduct occurred within the time and space of his employment. Id. However, the first and fourth prongs were not satisfied, because the employee's job description did not "involve or even contemplate violence." Id. at 559. For the third prong, the court determined that the employee's conduct was motivated by personal malice rather than an intent to serve the employer. Id.

Here, like in Matsko, Henry's "act" should be viewed as the "aggregate" of his actions. Harris, like the plaintiff in Matsko, invites this court to view the "act" as everything prior to the assault. Harris points to Henry's status as a KFC employee and his position behind the counter as evidence of his "act" being within the scope of his employment. Harris describes Henry's expletive-laced response to Harris as job related agitation. By construing Henry's "act" narrowly, Harris excludes the conduct that actually caused the injury, which was the assault on Harris. Rather, Henry's "act" began with his verbal interaction with Harris and ended with the assault. Accordingly, it is this "act" to which § 228 will be applied.

### 1.    Henry's act was not of the kind and nature that KFC expected him to perform.

Henry was not acting within the scope of his employment at KFC because his assault on Harris was outrageous and unrelated to his job as a cashier and cook. Under the first prong of § 228, an employee's act must be "of a kind and nature" that the employee is expected to perform to find that the employee was acting within the scope of his employment. Restatement (Second) of Agency § 228 (1958). As a "team member," Henry was a "regular employee," whose roles were limited to either cook or cashier. Neither of these roles required Henry to carry a gun while working or empowered him to assault customers. Even in the event of a robbery, managers coach team members to remain calm and do whatever the robber asks. Moreover, a KFC representative testified that KFC has a policy that prohibits employees from bringing a weapon to work, and an employee would be fired if found in violation of this policy. Harris has not come forward with evidence to contradict the KFC representative's statement.

Henry's actions were outrageous and criminal and far exceeded the scope of his employment. Henry was in no way furthering his employer's purpose by chasing Harris out of the restaurant and striking Harris in the face with a gun that Henry was not permitted to have at work. Accordingly, Henry's violent assault on Harris was not of a kind and nature that he was employed to perform and Harris' claim fails under the first prong of the scope of employment analysis.

### 2. Henry's assault on Harris occurred substantially within the authorized time and space limits of his employment.

Harris satisfies the second prong of the scope of employment test because the "act" occurred while Henry was working at KFC and while Henry was within the KFC restaurant. Under the second prong of § 228, an employee acts within the scope of his employment if the act occurs substantially within the authorized time and space limits of the employment. Restatement (Second) of Agency § 228 (1958). The incident occurred while Henry was at work, on the clock, and on the KFC store premises. Therefore, Harris satisfies the second prong of his allegation that Henry was acting within the scope of his employment.

### 3. Henry's vicious attack on Harris was in no way actuated by a purpose to serve the employer.

Henry's assault on Harris was not within the scope of Henry's employment because the assault was not actuated, in any way, by a purpose to serve KFC. Under the third prong of § 228, an employee's act is within the scope of his employment if it is actuated, at least in part, by a purpose to serve the employer. Restatement (Second) of Agency § 228 (1958).

The plaintiff mistakenly claims that there is a genuine issue of material fact in satisfying this prong. Because his assault stemmed from his annoyance with Harris' hesitation in ordering, the plaintiff suggests that Henry's assault can be interpreted as motivated by a "purpose to serve KFC." While Henry's verbal attack on Harris occurred during Harris' attempt to place his order, the assault that followed can only be viewed as an attack motivated by personal malice and not by a purpose to serve KFC. Like in

11

Matsko, this prong is not satisfied.  Henry's use of force was excessive, dangerous, irresponsible, and unreasonable.  Henry's actions had absolutely nothing to do with the furtherance of KFC's business and were motivated by other reasons, personal to Henry.  His actions were outrageous and criminal and certainly far from the scope of his employment.

### 4. Henry's use of force was unexpected by KFC.

Simply stated, KFC did not expect Henry to pistol-whip a customer who hesitated when placing his order.  Under the fourth prong of § 228, an employee's physical act is within the scope of his employment if the use of the force is not unexpected by the employer.  Restatement (Second) of Agency § 228 (1958).  Harris argues that he has met his burden under this prong because KFC did not provide a "squeaky clean employment record," (the record is only "one page long").  But this does not possibly indicate that KFC may have expected violence from Mr. Henry.  To the contrary, his one-page record contains basic information, none of which suggests that KFC should have expected violence.

Harris contends that other employees possibly expected violence from Henry, as evidenced by one employee stepping back from the register with a look like "I'm out of it" and another employee's statement to Henry that he could not "do it like that, not here."  However, the employer is KFC, not these other employees.  Even if the KFC employees expected violence from Mr. Henry, a conclusion that has no real factual basis, the record does not show that any of these employees informed KFC, the employer of

12

their suspicion.[7]  Further, in Matsko, there was evidence suggesting that other employees were aware of the assaulting employee's violent tendencies, and this did not factor into the court's consideration on this prong.  The record is devoid of any evidence that KFC expected violence from Henry.  Accordingly, Harris cannot establish that Henry was acting within the scope of his employment under the fourth prong.

### B. KFC's Negligence in Hiring and Supervising Mr. Henry

The undisputed material facts establish that KFC was not negligent in hiring and supervising Henry.   Under Pennsylvania law, to establish a cause of action for negligence, the plaintiff must show that the defendant owed the plaintiff a duty of care. Martin v. Evans, 711 A.2d 458, 461 (Pa. 1998). [8]  Pennsylvania applies the Restatement (Second) of Torts § 317 to determine whether an employer owed a third party a duty to control its employee who committed a violent act outside the scope of his or her employment.  Dempsey v. Walso Bureau, Inc., 246 A.2d 418, 419-20 (Pa. 1968); see also R.A. ex rel. N.A. v. First Church of Christ, 748 A.2d 692, 697 (stating Restatement (Second) of Torts § 317 restates existing tort law in Pennsylvania).

For an employer to be liable under § 317, the injured party must show that the employer knew or should have known of the need to exercise control of its employee. Dempsey, 246 A.2d at 422.  The § 317 analysis is twofold: (1) what was the employee's

---

[7] The KFC employees could have informed KFC by calling the anonymous 1-800 number.  See Frazier Dep. 17:5-13, Aug. 8, 2011.

[8] If a duty of care is established, Plaintiff must then show breach, causation, and harm.  But in cases alleging negligent hiring and supervising, the disputed issue is typically whether a duty to a third party exists. Without a duty, the elements of breach, causation, and harm cannot be analyzed. See, e.g., Brezinski v. World Truck Transfer, Inc., 755 A.2d 36, 41-42 (Pa. Super. Ct. 2000).

13

conduct prior to the incident in question, and was it of such a nature that would indicate a propensity for violence; and (2) did the employer know or, in the exercise of reasonable care, should it have known of the employee's prior conduct?  Id. at 422; see also Heller v. Patwil Homes, Inc., 713 A.2d 105, 108 (Pa. Super. Ct. 1998) (applying same two inquiries).

Henry's "conduct prior to the incident in question" refers to his workplace conduct prior to his assault on Harris.  In Dempsey v. Walso Bureau, Inc., the court examined an employee's prior conduct on the job to determine if it was such that would show a propensity for violence.  246 A.2d at 422-23.  The employee, a security guard at a bus terminal, assaulted the plaintiff and the plaintiff claimed the employee's prior conduct in the workplace indicated a propensity for violence.  Id. at 419.  The prior conduct on the record consisted of acts such as pushing intoxicated people, jabbing other employees with his nightstick, and striking the feet of people sleeping in the terminal.  Id. at 422.  The court found that these acts were "horseplay" and did not indicate a propensity for violence.  Id. at 423.

The record contains no evidence of any workplace conduct showing Henry's propensity for violence.  In Dempsey, despite acts that could be interpreted as violent, the court found that they did not show the defendant's inclination for violence.  Here, unlike in Dempsey, the record contains no such acts that could even possibly be interpreted as violent.  Harris' only evidence in the record is his observation that an employee's "look" and another employee's comments suggested an awareness of Henry's violent tendencies.  The plaintiff's subjective interpretation of a look and a comment are not objective acts

14

that would indicate a propensity for violence. Additionally, the plaintiff contends that some of the employees "may have known about the gun in Henry's possession." But without support in the record, this assertion is mere speculation and does not generate a genuine dispute of material fact.

Harris also claims that a basic background check would have revealed Henry's propensity for violence. The court in Heller considered the issue of whether a failure to conduct a background check rendered an employer liable under § 317 when an employee defrauded a customer through an investment scheme. 713 A.2d at 108. If the employer had run a background check, it would have discovered that the employee had previously been in trouble for investment fraud. Id. Despite this fact, the court held that the employer was not negligent in hiring the employee because discovery of his past trouble for investment fraud "may not have discouraged his employment in the unrelated real estate sales market." Id. at 109.

Here, Harris inaccurately contends that a background check would have revealed Henry's "violent" tendencies. The plaintiff highlights Henry's "9 prior arrests for violent crimes" as evidence in support of this position. With this assertion, the plaintiff puts forth a very liberal, if not outright false, interpretation of Henry's criminal record. Similar to the employer in Heller, if KFC had conducted a background check, it would have discovered a record of crimes "unrelated" to the crime in question. Up until October 3, 2007 (the date Henry assaulted Harris), Henry's criminal record shows that he was arrested four times -- not nine times as the Harris asserts. Moreover, he was only convicted on two charges, neither of which was a "violent" crime. There is no similarity

15

between those prior convictions and the charges associated with this incident which would have caused this attack by Henry to be foreseeable to KFC.

These convictions occurred approximately 5 and 6 years before the attack at KFC. Harris' argument is disingenuous because, in addition to mischaracterizing these crimes as violent, he uses Henry's criminal history subsequent to the incident as evidence that KFC knew or should have known about Henry's purported propensity for violence. KFC would not have been aware of Henry's propensity for violence even if it had a duty to conduct a background check. Accordingly, there are no material facts that could establish that KFC was negligent and breached a duty of care it owed to Harris by hiring Henry.

## IV.    CONCLUSION

Based upon the foregoing, I will grant KFC's motion for summary judgment. An appropriate Order follows.